**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| AARON WRIGHT | |
| Appellant | No. 3633 EDA 2018 |

Appeal from the Judgment of Sentence Entered  July 20, 2018
In the Court of Common Pleas of Philadelphia County
Criminal Division at No: CP-51-CR-0004368-2017,
CP-51-CR-0011708-2016

BEFORE:  BOWES, J., STABILE, J., and COLINS, J.[*]

MEMORANDUM BY STABILE, J.:                    Filed: September 24, 2020

Appellant, Aaron Wright, appeals from his judgment of sentence of 60½—136 years' imprisonment for the third degree murder, aggravated assault and other offenses.[1]   Appellant challenges the sufficiency of the evidence and the discretionary aspects of his sentence.  We affirm.

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] The court imposed the following terms of imprisonment at CP-51-CR-0011709-2016 (victim Joyce Quaweay):

(1) Third-Degree Murder, 18 Pa.C.S.A. § 2502(c): 20-40 years;
(2) Aggravated Assault (F1), 18 Pa.C.S.A., § 2702(a)(1): merged with Third Degree Murder;
(3) Conspiracy to Commit Murder of the Third Degree (F3), 18 Pa.C.S.A. § 903: 5-20 years;
(4) Unlawful Restraint (M1), 18 Pa.C.S.A. § 2902(a)(1): 2½-5 years;
(5) Possessing an Instrument of Crime (M1), 18 Pa.C.S.A. § 907(a): 2½-5 years;

The trial court accurately summarized the evidence as follows:

On July 29, 2016, medics arrived at 4633 Greene Street in the City and County of Philadelphia at approximately 10:30 AM to discover the naked, beaten body of Joyce Quaweay laying on the floor of the kitchen/dining room, unconscious. After numerous attempts to revive her over 20-30 minutes, medics pronounced her dead at 11:02 AM. Lt. Pendergast of the Philadelphia Fire Department asked Appellant if she had been using drugs, since it is not typical to see a 23-year-old woman unconscious and unresponsive. [Appellant] stated, "I'm not gonna lie, I was beating her and she went unconscious." At that point, Lt. Pendergast excused himself to call the police while other medics worked on Quaweay.

Dr. Albert Chu, the Deputy Chief Medical Examiner of the City of Philadelphia testified that he conducted a post mortem examination of Quaweay. Dr. Chu concluded to a reasonable degree of scientific certainty that the cause of Quaweay's death

---

(6) False Imprisonment (F2), 18 Pa.C.S.A. § 2903(a): 1-2 years;
(7) Corrupting the Morals of a Minor (M1), 18 Pa.C.S.A. § 6301(a)(1)(i): 2½-5 years.

The court imposed the following terms of imprisonment at CP-51-CR-0004368-2017 (victim A. A.-W.):

(1) Aggravated Assault (F1), 18 Pa.C.S.A. § 2702(a)(9): 10-20 years;
(2) Simple Assault (M2), 18 Pa.C.S.A. § 2701(a): merged with Aggravated Assault;
(3) Conspiracy (F1), 18 Pa.C.S.A. § 903: 5-20 years;
(4) Possessing an Instrument of Crime (M1), 18 Pa.C.S.A. § 907(a): 2½-5 years;
(5) Unlawful Restraint (F2), 18 Pa.C.S.A. § 2902(b)(1): 3½-7 years;
(6) False Imprisonment (F2), 18 Pa.C.S.A. § 2903(b): no further penalty;
(7) Corrupting the Morals of a Minor (M1), 18 Pa.C.S.A. § 6301(a)(1)(i): 2½-5 years;
(8) Recklessly Endangering Another Person (M2), 18 Pa.C.S.A. § 2705: no further penalty;
(9) Endangering the Welfare of Children (F3) 18 Pa.C.S.A. § 4304(a)(1): 3½-7 years.

was sudden cardiac death during physical assault and the manner of death was homicide.

Dr. Chu took photographs during the post mortem examination. He provided pictures of the lower half of [Quaweay's] body indicating bruising and scrapes up and down her legs from her ankles to her back. The bruises had a linear shape called "tram track contusions." He explained these contusions are typically created by an impact with a cylindrical object such as a pool cue or a broomstick. He opined that a police baton is consistent with the type of object that could cause these types of injuries. He indicated that these types of injuries require a significant forceful impact from swinging the object at the body. Dr. Chu testified that there were at least 50 of these tram track contusions on Quaweay's body.

In addition to the more than 50 tram track contusions, Dr. Chu observed and testified to photos he took of Quaweay's wrists, ankles and face. On her ankles and wrists, there were elongated abrasions on both wrists as well as her right ankle. Her face had an injury to her left eye and her chin. There was dried blood under nails and in her nostrils. Dr. Chu concluded that the injuries to her wrists and ankle are consistent with being caused by handcuffs.

Ultimately, Dr. Chu concluded that Quaweay's heart stopped its normal function and death resulted. In sudden cardiac arrest due to physical assault, such as a prolonged beating, body releases stress hormones that are normally beneficial to the body. These stress hormones cause the heart to beat faster and blood pressure to increase. When there is prolonged exposure to these high levels of hormones, the heart is at risk for sudden cardiac arrhythmia that can cause death and directly damage the heart causing death. Dr. Chu explained that his type of death would cause a person to have difficulty breathing, chest pain and loss of consciousness as their heart stopped beating. Dr. Chu ruled out all other potential causes of death.

Eight-year-old A. A.-W. witnessed the beating and death of Quaweay on July 29, 2016. Appellant is the father of A. A.-W.'s younger sister, M.W. [A. A.-W.'s] mother, sister and she lived with him for many years. She knew co-defendant Marquis Robinson from Appellant and knew them to be friends. She also testified that [Appellant] and Quaweay lived with Robinson at the

house on Greene Street. Quaweay and [Appellant] had two children together, D.W. and L.W., ages 10 months and 2 years, respectively. They lived at the house too. Although A. A.-W. no longer lived with [Appellant], she and her sister spent nights at his and Quaweay's house frequently because her mother worked overnight shifts. She spent the night on Greene Street on July 28, 2016.

On July 29, 2016, [Appellant] shook [A. A.-W.] awake in the very early morning hours and ordered her to make breakfast for M.W., D.W. and L.W. She immediately heard Quaweay screaming. She went downstairs to the kitchen/dining area to prepare breakfast, and saw Quaweay in the kitchen area, naked on a weight bench, with her hands handcuffed to a chain and her feet zip-tied to the weight bench. A. A.-W. noticed that Quaweay's waist was secured to the weight bench with a weight belt. Appellant and Robinson secured Quaweay's waist to the weight bench to prevent her from moving her body. She proceeded to prepare cereal and milk for herself and the younger children. While preparing the breakfast, Appellant and Robinson were taking turns beating Quaweay with a police type baton on her back and thighs while she was tied down to the weight bench. Quaweay screamed out while being beaten by [Appellant]. A. A.-W. testified [Appellant] hit Quaweay with the baton more than twenty times. Robinson put down the police baton and Appellant picked it up. While [Appellant] yelled at Quaweay, Robinson used the baton to hit Quaweay. A. A.-W. described that Robinson also used both of his hands on the baton and raised it up over his head and swung down on Quaweay's back, thighs and buttocks more than twenty times.

A. A.-W. gave the breakfast to the smaller children. Robinson ordered her to sit in the kitchen and watch while the beatings and what followed took place. [Appellant] used scissors to cut off Quaweay's hair and ordered that A. A.-W. put the hair in a plastic bag. Quaweay told Appellant and Robinson that she could not breathe. Her eyes were half way open. [Appellant] poured bottles of water on her face at least three times. She stopped breathing. They removed Quaweay from the weight bench and laid her on the floor. [Appellant] and Robinson performed CPR on her to no avail.

A. A.-W. was not the only witness to this brutal assault. Her mother, Tyreesa Alsop, arrived to the house sometime after A. A.-W. made breakfast, around 9:00 AM. Alsop observed Quaweay

secured to the weight bench, with her hands and feet bound. She testified that Appellant and Robinson would occasionally reposition her body, and they used a heavy, long chain to secure her to the bench. The Commonwealth introduced the chain recovered at the scene by the Crime Scene Unit of the Police Department. Alsop recalls [Appellant] asking Quaweay, "Why are you going through this?" and Quaweay responded, "Because I don't listen. I'm wicked." Alsop was in the house for more than an hour when she heard Quaweay say she could not breathe. It was after that when [Appellant] told Alsop to call 911. Once she did that, Appellant left the house before police arrived.

A. A.-W. witnessed these types of beatings on many occasions. She herself was also a victim of this abuse at the hands of Appellant and Robinson. When Appellant told her to "get on the bench," she knew that meant, "I was going to get beat." These beatings took place "many times." One such incident happened because her younger sister put a tablet into A. A.-W.'s book bag. She was restrained face down on the weight bench with her hands handcuffed to the bench and her waist secured with the weight belt around the weight bench and her body. Appellant and Robinson each took turns beating her with a belt, more than 20 times, each. One of these beatings left her with a permanent scar to her thigh. She was in pain; she testified, "It hurt." A. A.-W. did not immediately report these beatings. Her sister, M.W., reported to Tina Butler that she had been the victim of these assaults weeks after Appellant and Robinson killed Quaweay and the children were no longer living with their mother. M.W. told A. A.-W. to tell Butler what happened to them.

By way of stipulation, the Commonwealth introduced evidence that Appellant's weight at the time of his arrest was 200 pounds and 5'11". Robinson was 225 pounds and his height was 5'9". [Appellant] was a police officer at Temple University Police Department, and he stopped working there in 2012. Robinson was a Temple University Police Officer until the time of his arrest on the murder case.

Trial Court Opinion, 9/23/19, at 2-7 (citations omitted; minor stylistic revisions).

Following a bench trial, the trial court found Appellant guilty of the offenses listed above. On July 20, 2018, the court imposed sentence. Appellant filed timely post-sentence motions, which the court denied, and a timely notice of appeal. Both Appellant and the trial court complied with Pa.R.A.P. 1925.

Appellant raises two issues in this appeal:

1. Was the evidence sufficient to sustain Appellant's conviction for third-degree murder?

2. Did the trial court abuse its discretion in sentencing Appellant to an aggregate of sixty and one-half to one hundred thirty-six years' imprisonment?

Appellant's Brief at 5.

Appellant first contends that the evidence was insufficient to sustain his conviction for third degree murder. In reviewing a challenge to the sufficiency of the evidence, our standard of review is as follows:

> Because a determination of evidentiary sufficiency presents a question of law, our standard of review is de novo and our scope of review is plenary. In reviewing the sufficiency of the evidence, we must determine whether the evidence admitted at trial and all reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, were sufficient to prove every element of the offense beyond a reasonable doubt. [T]he facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. It is within the province of the fact-finder to determine the weight to be accorded to each witness's testimony and to believe all, part, or none of the evidence. The Commonwealth may sustain its burden of proving every element of the crime by means of wholly circumstantial evidence. Moreover, as an appellate court, we may not re-weigh the evidence and substitute our judgment for that of the fact-finder.

*Commonwealth v. Palmer*, 192 A.3d 85, 89 (Pa. Super. 2018).

To sustain a conviction of third-degree murder, the Commonwealth must prove that the defendant killed another person with malice. *Commonwealth v. Knox*, 219 A.3d 186, 195 (Pa. Super. 2019). Malice is defined as "exhibiting an extreme indifference to human life." *Id.* A fact-finder may find malice not only in an intentional killing, "but also in an unintentional homicide where the perpetrator consciously disregarded an unjustified and extremely high risk that his actions might cause death or serious bodily injury." *Id.*

In the present case, the trial court reasoned:

In [*Commonwealth v. Golphin*, 161 A.3d 1009 (Pa. Super. 2017)], [the] defendant punched and kicked a 4 year old child, causing a laceration to her liver. In that case, the Court held Golphin beat the victim on numerous occasions culminating in an episode causing her to bleed to death. "In doing so, [Appellant] displayed the requisite level of malice, that is wickedness of disposition, hardness of heart, recklessness of consequences, and a mind regardless of social duty."

In *Commonwealth v. Bowden*, 276 A.2d 530 (Pa. 1971), the defendant beat a child with a stick multiple times, over a period of time. There the court held that even though the appellant may not have had the intent to kill, "nevertheless, that he, an adult then thirty-five years of age, inflicted upon a six year old boy a cruel, wanton and ruthless beating with reckless disregard of the probability of great bodily harm. The evidence supports beyond a reasonable doubt a finding of malice."

The same is true in the instant case. When viewing all the evidence and the reasonable inferences drawn from the circumstances of the killing, malice is clearly established. Strapping [Quaweay's] naked body to the weight bench with a belt around her waist and the bench, the use of chains, handcuffs, and zip ties, pouring water over her face and beating her with a police

baton causing more than 55 "tram track marks" all over her body shows a wickedness of disposition, a hardness of heart, recklessness of consequences and a mind regardless of social duty sufficient to establish the malice required for third degree murder. **Golphin**, 161 A.3d at 1018.

Trial Court Opinion, 9/23/19, at 9. Based on the trial court's analysis, we agree that the evidence was sufficient to sustain Appellant's conviction for third degree murder.

Next, Appellant contends that the trial court abused its discretion by imposing an excessive sentence without considering mitigating factors. We disagree.

Appellant must satisfy four factors in order for this Court to consider his challenge to the discretionary aspects of his sentence. We must consider: (1) whether he has filed a timely notice of appeal, **see** Pa.R.A.P. 902 and 903; (2) whether he properly preserved the issue at sentencing or in a motion to reconsider and modify sentence, **see** Pa.R.Crim.P. 720; (3) whether Appellant's brief has a fatal defect, Pa.R.A.P. 2119(f); and (4) whether he presents a substantial question that his sentence is not appropriate under the Sentencing Code, **see** 42 Pa.C.S.A. § 9781(b). **Commonwealth v. Samuel**, 102 A.3d 1001, 1006-07 (Pa. Super. 2014). Appellant satisfied the first three factors by filing a timely notice of appeal, challenging the length of his sentence in post-sentence motions and including a Pa.R.A.P. 2119(f) statement in his brief explaining why this Court should address his sentencing argument. With regard to the fourth factor, whether Appellant has raised a

substantial question, although bald claims of an excessive sentence do not raise a substantial question, ***Commonwealth v. Swope***, 123 A.3d 333, 339 (Pa. Super. 2015), "an excessiveness claim in conjunction with an assertion that the court did not adequately consider a mitigating factor may present a substantial question." ***Commonwealth v. Zeigler***, 112 A.3d 656, 662 (Pa. Super. 2015). Since Appellant claims both that his sentence is excessive and that the court failed to consider mitigating factors, we will consider the merits of his claim.

The trial court explained that it had the benefit of a presentence investigation report, and therefore it was presumed that the court took all relevant mitigating factors into account. Trial Ct. Op. at 12. The court further stated that it took into account all relevant factors, including mitigating factors and Appellant's rehabilitative needs, in fashioning his sentence. Next, the court noted that Appellant's prior record score was zero. ***Id.*** at 13. Nevertheless, the court concluded, several reasons warranted a sentence outside the Sentencing Guidelines:

> Some of the reasons that the court went outside the guidelines are based upon factors such as the methodical, torturous, brutal methods Appellant and [Robinson] used to assault and kill Quaweay, beating her so badly it caused her to die. The brutality of this crime was made clear in the photographs of the victim's body that were entered into evidence at the trial and subsequently at the sentencing hearing. Other factors that take this crime out of the guidelines include the fact that he and [Robinson] made a child participate in this horror by requiring A. A.-W. to sit in the same room and watch them commit these atrocities. They made her clean up the hair they had chopped off the dying victim's head. They made the child watch as both Appellant and [Robinson] each

beat her more than 20 times with a police asp, swinging it with both hands over their heads and striking downward, while Quaweay was handcuffed, chained and belted to the bench. She was witness to the fact that Quaweay said she couldn't breathe and she watched as the solution put forward by Appellant and [Robinson] was to throw water on her face multiple times. All of these actions, in addition to the acts mentioned in the Sentencing Hearing, firmly place this case well outside the guidelines.

The same can be said for the actions taken by Appellant regarding A. A.-W.'s beatings. There was only one charge of aggravated assault, yet the victim testified to separate beatings she sustained at Appellant's hands. Each beating took place in the same way, starting with "get on the weight bench," which she knew meant she was about to get a beating. She testified this happened "many times," but talked specifically about two times on the weight bench being hit with a police baton and a belt, and one time when Appellant smacked her across the face causing her nose to bleed and one time being hurt on her hand trying to protect her body from being hit with a belt. The heavy metal chains, metal handcuffs, zip ties and leather weight belt used to restrain the victim to prevent her from moving while being struck repeatedly with weapons exceeded the means necessary to accomplish any purported "punishment." Because of these factors, in addition to the factors mentioned above and at the sentencing hearing, were the reasons the court went above the guidelines, even though Appellant's prior record score was zero.

The court gave appropriate consideration to Pennsylvania Sentencing Guidelines §303.11(a), Purpose of Sentencing. Section 303.11(a) states, "This is a sentencing system with a primary focus on retribution, but one which allows for the fulfillment of other sentencing purposes including rehabilitation, deterrence and incapacitation." 204 Pa. Code § 303.11(a).

In sentencing Appellant, the court took into consideration Appellant's rehabilitative needs and concluded that Appellant was not amenable to rehabilitation. The court concluded that Appellant was adequately educated, previously employed, not a user of drugs, and Appellant was a sworn law enforcement officer who should have appreciated the depravity of his conduct. In fact, he highlighted his 20 years of law enforcement experience in his allocution. He referred to the beating death of Quaweay as her "passing away," clearly lacking an ability to take responsibility for

the more than 55 tram track bruises across the body of Quaweay. He indicated that despite how he treated Quaweay on July 29, 2016, he "loved" her and "loved women." His overall behavior and statements made during sentencing clearly show his lack of ability to appreciate the gravity of his actions that day and in previously beating women and girls. After considering all factors related to purposes of sentencing, including retribution, the court rejected rehabilitation as a goal of sentencing Appellant.

Trial Court Opinion, 9/23/19, at 13-15 (minor stylistic revisions). We fully agree with the trial court's reasoning that Appellant's cruelty and depraved acts toward Quaweay and A. A.-W. warrant a lengthy sentence. Although Appellant believes the court should have given more weight to mitigating factors, this does not render his sentence excessive or unreasonable. *Commonwealth v. Macias*, 968 A.2d 773, 778 (Pa. Super. 2009) ("The sentencing court merely chose not to give the mitigating factors as much weight as Appellant would have liked[.] We cannot re-weigh the sentencing factors and impose our judgment in place of the sentencing court"). Sentencing courts may not "intentional[ly] fail[]" to consider evidence at sentencing of a defendant's good behavior or potential for rehabilitation. *Commonwealth v. Losch*, 535 A.2d 115, 121 (Pa. Super. 1987); *Commonwealth v. Clark*, —A.3d—, 2020 WL 2442328, **4-5 (Pa. Super. 2019) (unpublished memorandum). In this case, the court did not fail to consider evidence of Appellant's capacity for rehabilitation. It "took into consideration Appellant's rehabilitative needs" but chose not to give this any weight. Trial Court Opinion, 9/23/19, at 15. No relief is due.

Judgment of sentence affirmed.

- 11 -

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>9/24/20</u>